May it please the court. Suzanne Luban for Mr. Shirley and my co-counsel Lupe Martinez is here for Cliffina Johnson. We'd like to reserve two minutes for rebuttal. And by the way, your honors, that was not my telephone that went off. So are you sharing argument or we are? Well, we're yes, we are. We are. So how much time are you going to use? Because seven minutes, I hope, or thereabouts. So the discovery of the information about Clarence Walker was devastating to the government in this case. The government at trial in Mr. Shirley and Ms. Johnson's trial touted Walker's integrity as a government official. The prosecutor talked about his duty and he testified about his duty to protect the IRS from corruption. That the government represented him as an ethical, reliable, truthful government official, and talked about his job as an investigator of people who violated the tax laws. He testified that he was careful to avoid inducing or corrupting others. He used that language. But yet, in fact, as it turns out, throughout, before, during, and after Walker's testimony in this trial, he was, in fact, a corrupt, lying criminal. Yes, but when, at what point was that known? So in, I believe it's 2002, there is a warrant to search his house. Six months prior to that, Connie Militano, the FBI agent, or excuse me, the TICTA agent, learns that Clarence Walker's name is on checks from these people who are laundering pirate software. And so the investigation eventually takes them to the point where they've concluded the investigation at the date of her declaration. And that's when they believe that they have probable cause to search his house. But even prior to that point, they have. But you're trying to import a Brady standard to the evidence. And in order for it to be a Brady standard, you have to show that you have to, that Walker's knowledge of his own misconduct has to be attributed to the government. And the cases that you cite seem to deal with agents as opposed to civilian witnesses. We have two alternative arguments. And, Ashley, Mr. Martinez is going to address the specific point of that. All right. I can wait. Walker, if that's okay, Walker is an agent of the government. But with regard to the standard of materiality, so the question here really is if you  knew about this during the three-year window, three-year post-verdict window, that the defendants could have filed a Rule 33 motion for a new trial, and so that the government had a duty to disclose that. And even Carlos Singh, the prosecutor in this case, specifically knew about it and talked to those agents. No, but, okay. When you say it, it is that Walker was going to be indicted, that he was under investigation for criminal activity that had nothing to do with these particular people. Well, that is the way that the government portrays it, that his activity had nothing to do with – it had nothing to do with these individual people, but it had everything to do with his position as an IRS agent. Yes. An impeachment of him as a – and the impression that he was a lawful, honorable public servant. Correct. And that he was careful in not inducing these individuals. You have to remember that there's a series of unrecorded telephone calls. And the government attributes what Walker's version of those telephone calls and meetings in the parking lot with Ms. Johnson as establishing predisposition on both the part of Ms. Johnson and her speaking for Mr. Shirley, the part of Mr. Shirley. So if the jury learned that – upon retrial – that, in fact, Walker was allying money laundering, unethical government official abusing his position, then our position is that they would disregard everything he said that's not proven by a recording. And so if you disregard Walker's version of those conversations in the parking lot where he says that she talked to him about Fred wants to give you a car and Fred will pay you money, but, in fact, you believe her version, which is that Walker's talking – she's saying my friend Fred has a problem. He doesn't understand his forms. He's beside himself. Could you help him? She's friends with Clarence. She knows that he understands these things. He leads her on to believe that he's going to help her. That's her version, that they're just going to help. And that version is supported by the recorded phone calls in the early – up through March. There are recorded phone calls where she says all Fred wants is he wants you to explain his form to him. That is consistent with her version. So if the jury learns that he's a liar, they're going to disregard his testimony about what happened in those meetings. Okay. I'm just trying to understand a little bit about the nature of the testimony and when the – of this evidence and when the government knew about it. The government didn't know about it until, I take it, after the verdict. Yes. It was after the verdict, during the time that actually Mr. Shirley had still not yet gone to prison, and I believe maybe also Ms. Johnson. So those two individuals could have been spared their entire prison terms that they served during the time period that this was not disclosed. Mr. Singh knew about the investigation of Clarence Walker, but he did not disclose it. And so they were prohibited from filing a motion for a new trial. If the district court was correct in its 2255 ruling, does that pretty well end your case? Yes. Do we have to – is that the sine qua non? Do we have to find that error first?  So one of the things that the district court – Well, let me ask you, given that statement, we've got Easterwood and we've got Sims, right? Or – I'm not pushing your remembrance of the cases here. I'm not – this is not a graduate exam. Okay. Give me a clue. I apologize. There are a lot of cases in this. So we've got – well, we've got the Easterwood rule that the – when a 2255 claim is based on a prior court ruling, the statute of limitations begins to run when the court ruling is available in that case in the prison library. Oh, we're talking about the discovery issue. Yeah. Then you have Sims, and it says, well, yeah, that rule's right, but when we're talking about general information, then we're talking – then we – it adopts an access rule. It's when the evidence is available or accessible. To the defendant. To the defendant. Reasonably. And it doesn't put the defendant on a you've got to check your docket sheet every single day to see if something has been put on it, but rather a reasonableness fact determination. Right. And the only way this would be disclosed would be in the district court filings in PACER. Right. And what did the district court do on that point? The court ruled that my client's petition was timely and that he couldn't have known about it with due diligence, having been in the State prison during the time that the indictment was filed. Right. And so the district court ruled in our favor in that regard. But if, in fact, the government is right and that Easterwood v. Champion should be read more broadly and that we should compare this case to where the information is in the docket sheet to the Easterwood situation where the information is in a reported case in the law library, that you lose. Your Honor, I think even under Easterwood, I believe that Easterwood controls, but that Easterwood does not address the filing of a document in a court, in the district court. Well, that's what I'm saying. Where only people who are members of PACER or who physically go to the court to seek it would have access to that. It's a lot different than in prison where it's well known that the prison inmates are checking every advance sheet every day to see if something pertains to their case. Right. And so I think even under that, the district court is correct. I want to quickly point out something that the district court ruled that there was no evidence in the record of inducement of Mr. Shirley, and that is clearly erroneous. And I want to point you specifically to the government's S.E.R. or I guess it's G.E.R. is what they call it, 99 and 102. And 99 is a conversation on April 27th where Clarence Walker over and over again, this is just him and Ms. Johnson, orders her to go to my client to call him tonight to tell him he has to come to me. He has to specifically ask me to do something about his audit file. Basically, he has to offer to bribe me and to say how much money he's going to pay me. Walker tells that to her throughout a very long conversation many, many times. And finally at the end, she promises to do it. And then the next day in the meeting, from the get-go, my client says to him, can we do business? I don't know how to go about this, but Klafina says, you said that you can help me and I need to ask you and I'm asking you. I think you need to bring it over to your colleague. May it please the Court. My name is Lupe Martinez and I represent Klafina Johnson. I'd like to play some context in which this case arises. We're talking about undisclosed criminal activities of Clarence Walker, a revenue agent. And if you look at the declaration of Ms. Connie Leung, who was the TIGDA investigator, the misconduct that she alleges in her declaration occurred from December 1999 through mid-2002. The trial in this case occurred from September 11th through October 2nd. So we have undisclosed... Of what year? Of what year? Of 2000. The trial was September 11th, 2000 through October 2000. The misconduct, December 1999 through mid-2002, which is when the government found out about it. Right. In 2002. Help us on the timeline. There's some subpoenas issued and search warrants issued. What was the date of those? Those were in 2002, Your Honor. 2002. And I'm referencing... So it was after the trial. Correct. But the point I'm trying to make is that the undisclosed conduct here occurred before, during, and after the trial. Now, the fact that the government didn't know about it... Well, that's where I think you have to be able to bring it in to Brady. You have to be able to attribute Walker's knowledge of his own misconduct. You have to be able to attribute it to the government. And the cases that you cite all deal with enforcement agents' misconduct, not civilian employees who are cooperating witnesses. So that's the leap you've got to make, in my view, if you want to bring it in to a Brady analysis. Well, there's two types of analysis that we're going to talk about, that I'm going to talk about. First is the Brady analysis that Your Honor aptly points out. And we cited Osborne and a Ninth Circuit case of Thomas in our brief. The scope of post-trial Brady is something that's not clearly defined in the case law. There's no bright line that says, okay, so many days or at a certain point after trial, then you're in Rule 33 land where you have to have sufficient evidence to get a new trial. Okay? And that's one standard of materiality. But there's other cases, and Ninth Circuit cases, which Osborne did not overrule because Osborne was not a Brady case, in which the Ninth Circuit has indicated without spelling out specifically at what point the Brady obligation that exists prior to trial and during trial ends. The judge in this case found that the Brady obligation extended through the time frame during which a motion for a new trial could be brought. But, again, Your Honor is correct. There is no clear defined law that says at what point does Brady, the Brady obligation end and you're into the Rule 33 land. The Ninth Circuit indicates that the duty continues. That's undefined, as I've indicated. But I think that's why I come back to the context. We have a situation here where the undisclosed conduct, which is egregious, very egregious, occurs during the time frame before, during, and after the trial. Now, you're right. We think that Walker was a government agent. He didn't have the title of peace officer. But throughout the trial, starting in the opening statement, he was identified as somebody who worked as a revenue agent. He was ethical. He was honest. His job was to prevent wrongdoing and advance ethical standards in the IRS. He was. Kagan. Did the district court rule on whether or not this would have made any difference? Excuse me? Didn't the district court make a ruling that this wouldn't have made much difference anyway? Well, we submit that it would have made a difference. It's not what you submitted. No. I'm asking what the district court said. And I thought that was the ruling. The district court. The ruling was that he was not a peace officer, that you couldn't attribute his conduct to the government. We submit that the court erred in that respect, because under the facts of this particular case, in this circumstance, he was an integral member of the prosecution team. He worked and had worked in the past. I'm not asking that. I'm really asking as to how what difference it would have made if it had been disclosed. Because it's clear that the government didn't know about this during trial. The difference it would have made, all his conduct would have been attributable to the government. No, I don't hear you. That's not really what I was asking. Why didn't the district court say that this was essentially impeachment evidence that wouldn't have resulted in any different result? Well, that's what the district court said. Don't we have to defer to that? I mean, the district court heard the whole trial. That's what I'm trying to get at. Right. He was there. He's a good district judge. Excuse me? He's a good district judge. He heard the whole trial. Yes. But as my co-counsel indicates, that we believe the judge used the wrong standard of materiality in this case. We think that the fact of the matter is that there was a legal error, not a factual error. Yes, there was a legal error. Because obviously factual errors are problematic for you in terms of the lens that we have to review this on habeas, right? Correct. Okay. So we believe that there was a legal error that is a matter of law. The standard that was used was what? That you say is error? The standard for materiality is whether or not there's a reasonable likelihood. That's what the district court said. I'm sorry. May I just have a moment to confirm? We don't usually have, like, call a friend is not one of your lifelines here. Right. I will do that, Your Honor. Let's try to get this in the ballot in 30 seconds. Your Honor, the district court, we submit, used the wrong standard. The district court standard was whether or not the jury was wrong in its determination. And we submit the standard is whether or not there's some likelihood that the jury could have come to a different conclusion had the evidence come in. All right. Thank you. Thank you. Good morning, Your Honors. My name is Mary Jean Chan. And I represent the United States in this appeal. Well, since people don't really like the IRS that much anyway, could this be any worse with three agents that are either taking bribes or laundering money or things along those lines? I certainly had that reaction myself when I was reading the record, Your Honor. But this case comes down to whether, as Your Honors pointed out previously, whether the government violated its disclosure duties under Brady. And it absolutely did not because the government had no inkling that Mr. Walker had engaged in any misconduct during the time of the trial. So the standard is should a new trial be granted? That's exactly right, Your Honor. And let me ask you on that point. Yes. Because Judge Callahan's point is pretty evident here, that you have a lion-cheating IRS agent who might be trying to take the focus off of him by trying to find a lion-cheating taxpayer. And so what he does so that he kind of looks good, the way he's represented, in fact, to be, is he goes around trying to entrap somebody else and all the while covering his own misdeeds. Why wouldn't that be such strong impeachment evidence that it would rise to the level of It would not be such strong evidence because the bulk of the evidence against the defendants was in tape recordings which show very clearly that Mr. Shirley was the first one to initiate the bribery proposal to Mr. Walker as well as Ms. Johnson. In fact, Ms. Johnson did testify that Mr. Walker had suggested that he could charge Mr. Shirley for helping with his audit. Right. But at that point, an honest IRS agent might have laughed and said, are you kidding me? I mean, are you serious? And might have ended the whole thing. But instead, this agent proceeds to ensnarl the defendant, if not entrap him, into these continued phone calls. I'm sorry. I'm a little bit confused about which agent you're talking about. The point is that an honest agent would not necessarily Are you talking about Mr. Walker? Of course. I'm sorry. That an honest agent would not necessarily have acted the way Mr. Walker acted and that the fact that Mr. Walker acted in the manner that he did had motives quite apart from the motives of the normal agent. Well, I have two answers to that. First of all, Mr. Walker had signed up at that point with TIGTA as a cooperating employee, a civilian witness, but nevertheless a cooperating employee. So it was his job to collect evidence of a bribery overture. So to the extent that he didn't stop things, that was because he was part of an investigation. The second point I want to make with respect to that is that to the extent that this kind of information would be brought up in trial to impeach Mr. Walker, Mr. Walker has always maintained his innocence of these charges, particularly the bribery and striking charges. He was actually not acquitted, but the jury hung on those two charges. So the government ultimately was unable to prove those charges beyond a reasonable doubt. At most, the defendants would be able to impeach him by asking him, did you, in fact, accept bribes, solicit bribes in these situations in 1999 through, you know, afterwards? And he would have said, no, I'm innocent of those charges. And under the rules of evidence, the defendants would not be entitled to bring any extrinsic evidence of this should there be any to exist. So, no, that would not be enough. And in addition, if we look at it, as I said before, the bulk work of the evidence in this was all recordings. With respect to Shirley, there has been no contention at all that any of the conversations between him and Walker were not recorded. The first time they ever met on March 27, Mr. Shirley says, I'd like to help you with the car if I can, and you can help me with my audit. This meeting was not about Form 2807 as contested as is proposed by the defendants. It's very clearly a pretext, because Mr. Shirley had actually already signed this form several weeks before meeting with Mr. Walker. Had he wanted to meet with Mr. Walker before he signed, he could have, and he missed meetings, and he didn't choose to meet with him. It was pretextual. Any inducement that you might want to ascribe to Mr. Walker from that first meeting in describing the consequences of Mr. Shirley's audit certainly would have been attenuated by the fact that a month passed between that first meeting when he said anything and the time when Mr. Shirley said anything. And that's why I'm saying that to the extent that we're looking at inducement, which is to prove entrapment, you have to either show or to disprove entrapment, which is the government's burden, that there was no inducement or that there was predisposition. So some of the things I've said just now relating to Mr. Shirley being the first to bring it up go to predisposition.  And to the extent that there's some credence that wants the judge's, your Honor's, would give to the remarks, to the argument that the defendants have made, that what Mr. Walker said at that first meeting constituted inducement in terms of informing Mr. Shirley about the consequences of the audit. My response to that is that a month passed between those remarks and the time when Mr. Shirley said in April, hey, you know, I want to pay you $20,000 to fix my audit. So that month, there's no contention that there were any discussions between the two of them between those two periods of time. That month certainly attenuates any inducement that you want to credit the defendants and the time when Mr. Shirley brings up the suggestion. And, in fact, Mr. Shirley was very enthusiastic about this proposition of having an IRS person under his wing. He suggested also that Mr. Walker could, in addition to fixing his audit, do something completely different, which is initiate an audit against a former business partner against whom he had a lot of animosity because of the lawsuit. This was all recorded? This was all recorded, Your Honors. This is all in recorded testimony. And this is why the district court, even under the Brady standard, found that this would not have made a difference, that the confidence in the verdict would not be undermined, and certainly that it's not likely that a new trial would procure an acquittal. Now, similarly for Johnson. Now, Johnson did suggest that she had some unrecorded conversations, but a lot of her conversations, most of her conversations with Mr. Walker were actually recorded. And in those recordings, she made very absent statements. For example, she said, in trying to get a larger stake of the money, I'm the one who thought of it. Well, she said, no, you don't get all the money. We 50-50 or something, right? That's right. She said, you know, give me money. I want the money. And, quote, I'm the one who thought of it. This is at government excerpts of record 129. She said to Mr. Walker, I have to know what you can do for Mr. Shirley. I have to get money out of him. This is at government excerpts of record 83 through 87. When she was arrested eventually in June 1999, she confessed that she had gotten a car from Mr. Shirley for introducing him to Mr. Walker, and that Mr. Shirley had said that he would be willing to pay somebody to help fix his audit. Did he – did she essentially set the whole thing up? She certainly did, Your Honor. She was the one who proposed this. In their first conversation, in one of their earliest recorded conversations on March 18th, she is the first one to say that Shirley suggested, well, hell, Cliff, if he could just help me out, I'll give him a car. I want to get this man, that is, the auditor, Mr. Sutherland, off my ass. That's all. She said this knowing, and she also set up this meeting and said that it was about reform 2807, but she too knew that was protectual. She said that it was a self-explanatory form, and she knew that prior to their meeting that Mr. Shirley had already signed it. She was also the one who vigorously pursued Mr. Walker from the beginning. Ms. Olson, his secretary, testified that in March, some weeks in March, she called him, that is, Ms. Johnson called Mr. Walker two to three times a day trying to find out where he was, wondering why he wasn't returning her phone calls, and that, you know, she saw his car in the parking lot. Why wasn't he returning her phone calls? In reporting ---- What is the consequence of California's, of this circuit's rejection of the derivative entrapment rule? That has a lot of consequences in this very positive towards the government, Your Honor, because to the extent that the defendants say that Ms. Johnson said anything or suggested anything to Mr. Shirley, which then caused him to pay Mr. Walker to help fix his audit, that's derivative entrapment, and that's not a defense. There's no contention by either one of the defendants that they actually did bribe Mr. Walker and that there was overwhelming evidence of this. The only issue, Your Honors, was whether there was entrapment. And there's neither any inducement. In fact, under a different standard of review, but with respect to Ms. Johnson in her direct appeal, this Court affirmed the verdict saying that there was no inducement, because at most, what Mr. ---- according to ---- if you credit everything that Ms. Johnson says, what Mr. Walker said in these unreported conversations were that he himself was going to charge Mr. Shirley for helping him with his audit. That had nothing to do with Ms. Johnson. That had only anything to do with Mr. Walker and Mr. Shirley. Now, to the extent that Ms. Johnson saw then an opportunity for herself to insert her into those proceedings, become a broker, claim some credit, that's opportunity. She sees an idea. She sees an opportunity. And that is not inducement. And this Court said that, and that's absolutely correct under this circuit's case law. So there was no entrapment in this case. It doesn't survive the materiality requirement under either the new trial standard, which is the correct standard here, or under the Brady standard. Now, just very quickly, I want to talk about, just to clarify for the Court, what the timeline was of this. I think that the Court agrees that it's not a Brady standard. But what happened here is that it wasn't TIGTA, which was the investigative agency that was involved in the defendant's trial, that first got an inkling that Mr. Walker was engaging in misconduct. The first person to get a clue about this was the Criminal Investigation Division of the IRS, which is a separate agency. And it was in investigating a separate proceeding, a separate investigation, that Mr. Walker was approached as a witness to that. And it was only then, which was nine months after the final verdict in this case, that they had any clue that Mr. Walker was doing anything. It wasn't until 19 months after the final verdict in this case that any IRS personnel action was taken against Mr. Walker, verifying that in their investigation the government believed indeed that Mr. Walker had engaged in misconduct. Now, again, I have to reemphasize that Mr. Walker himself has consistently denied any wrongdoing in this. He has said that he's innocent. He's gone to trial. He's appealed his conviction for only the failure to file currency transaction reports. But he has always – and he's said that even those convictions were ordained on perjure testimony. He would not have said that or admitted that he did any of this. So the idea of imputing to the government anything that – any of his knowledge is really nonsensical, because somehow you'd have to say – go past what he admits in the end, what he knew, to some kind of pure sense of what he might have been in his head, extract that, and then impose it upon the government. How do you do that? That's an impossible standard. That's not what Cowles and Whitley said that – set out for the standard for imputing information to the government. What can be imputed to the government is only – are only things that, through some regular procedures or regulations, the government could actually know. In this case, the government couldn't know. And the panel is right that the district court found that Mr. Walker was not a member of the prosecution team, and that this is a finding that's only reviewed for clear error. And this is absolutely a right finding, because by the defendant's own proffer at the trial, Mr. Walker was a cooperating employee, which in Mr. Martinez's words at trial is, quote, analogous to a citizen informant in other types of criminal investigations. I'd like to turn, finally, very quickly to the time bar issue which Judge Lucero raised, which is that the government's position is that Easterwood does apply here. Under 2255F4, a motion must – based on new evidence – must be filed within one year of, quote, the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence. There's an absolute date there. And that absolute date, at the latest – That gives you the sense of comfort of having a real – an easy date for appellate courts to look at. That's correct, Your Honor. But the Sims access rule is seemingly more equitable to defendants in that it gives the district court a factual opportunity to determine whether, in fact, there was reasonable access. Well, I think that the defendant, Mr. Shirley, had reasonable access as soon as he was out of prison. Certainly, he may have had access before he was in prison. We're not talking about an opinion that wasn't available. We're talking about facts that were in the newspapers, which he might have had access to. Right. But even if we take it as the date of his release – I guess what you're raising is a different question, and I'm intrigued by it. And that is, you're saying there really wasn't anything of an admissible nature that was determined at that time, because he – at most, he was indicted, and you couldn't ask a juror – you couldn't ask in front of the jury, have you been indicted, because there's a presumption of innocence. So you're saying there's really no evidence that should have been considered that wasn't considered. That's correct, Your Honors. I mean, at most, you could say exactly, have you been indicted. Yes, I have. I'm innocent of all the charges. Right.  Okay. Thank you very much, Your Honors. I would ask that you affirm. Thank you. Your Honors, I just want to address some of the comments that were made that there was no inducement by Walker. Well, I think you've used your time.  Are there any questions? The clock runs in reverse order. Yeah. It turns red, and then it keeps going. We're in overtime. Yeah. Thank you. There are no further questions, and you've both used your time. Sorry. The case just argued is submitted for decision.
judges: Lucero, Schroeder, Callahan